http://www.va.gov/vetapp16/Files2/1617298.txt

Citation Nr: 1617298 
Decision Date: 04/29/16 Archive Date: 05/04/16

DOCKET NO. 13-14 106 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Winston-Salem, North Carolina

THE ISSUE

Entitlement to an initial rating in excess of 80 percent for narcolepsy with REM behavior disorder and without seizure disorder.

REPRESENTATION

Veteran represented by: Paul M. Goodson, Attorney

WITNESS AT HEARING ON APPEAL

The Veteran

ATTORNEY FOR THE BOARD

Shauna M. Watkins, Counsel

INTRODUCTION

The Veteran served on active duty from November 1995 to November 2000. 

This matter comes before the Board of Veterans' Appeals (Board) on appeal from a rating decisions issued by the Department of Veterans Affairs (VA) Regional Office (RO) in Winston Salem, North Carolina. In a December 2009 rating decision, the RO granted service connection for narcolepsy with a 10 percent disability rating effective July 30, 2009. In a September 2010 rating decision, the RO continued a 10 percent disability rating for narcolepsy. In an August 2011 rating decision, the RO again continued a 10 percent disability rating for narcolepsy. 

In February 2014, the Veteran testified during a hearing before the undersigned Veterans Law Judge (VLJ) by videoconference; a transcript of that hearing is of record. 

In March 2015, the Board remanded this appeal to the RO via the Appeals Management Center (AMC), in Washington, DC, for further development. Upon remand, the RO issued another rating decision in December 2015, which increased the disability rating to 80 percent, retroactively effective from July 30, 2009. The Veteran has continued to appeal, requesting an even higher disability rating. See AB v. Brown, 6 Vet. App. 35, 38-39 (1993) (indicating that a veteran is presumed to be seeking the highest possible rating unless he or she expressly indicates otherwise).

This appeal was processed using the VBMS paperless claims processing system. Accordingly, any future consideration of this Veteran's case should take into consideration the existence of this electronic record, in addition to the Veteran's Virtual VA paperless claims file.

FINDINGS OF FACT

1. Throughout the pendency of the appeal, the competent lay and medical evidence reflects that the service-connected narcolepsy with REM behavior disorder and without seizure disorder has been manifested by no more than 5 episodes of sleep attacks per day, which is considered analogous to minor seizures manifested by brief interruptions in consciousness. 

2. There is no medical evidence of cataplexy, and the preponderance of the medical evidence is against a finding that the frequency of the Veteran's narcoleptic episodes more nearly approximates a major seizure as contemplated by the rating criteria.

CONCLUSION OF LAW

The criteria for an initial disability rating in excess of 80 percent for narcolepsy with REM behavior disorder and without seizure disorder are not met. 38 U.S.C.A. § 1155 (West 2014); 38 C.F.R. §§ 4.1, 4.3, 4.7, 4.20, 4.124a, Diagnostic Codes (DCs) 8108-8911 (2015).

REASONS AND BASES FOR FINDINGS AND CONCLUSION

The Board has thoroughly reviewed all the evidence in the Veteran's claims file. Although the Board has an obligation to provide reasons and bases supporting this decision, there is no need to discuss, in detail, the evidence submitted by the Veteran or on his behalf. See Gonzales v. West, 218 F.3d 1378, 1380-81 (Fed. Cir. 2000) (the Board must review the entire record, but does not have to discuss each piece of evidence). The analysis below focuses on the most salient and relevant evidence and on what this evidence shows, or fails to show, on the claim. The Veteran must not assume that the Board has overlooked pieces of evidence that are not explicitly discussed herein. See Timberlake v. Gober, 14 Vet. App. 122 (2000) (the law requires only that the Board address its reasons for rejecting evidence favorable to the veteran). 
I. VA's Duties to Notify and Assist

Under applicable law, VA has a duty to notify and assist claimants in substantiating a claim for VA benefits. 38 U.S.C.A. §§ 5100, 5102, 5103, 5103A, 5107, 5126 (West 2014); 38 C.F.R. §§ 3.102, 3.156(a), 3.159, 3.326(a) (2015).

Upon receipt of a complete or substantially complete application for benefits, VA is required to notify the claimant and his or her representative, if any, of any information, and any medical or lay evidence, that is necessary to substantiate the claim. 38 U.S.C.A. § 5103(a); 38 C.F.R. § 3.159(b); Quartuccio v. Principi, 16 Vet. App. 183 (2002). Proper notice from VA must inform the claimant of any information and evidence not of record: (1) that is necessary to substantiate the claim; (2) that VA will seek to provide; and, (3) that the claimant is expected to provide. This notice must be provided prior to an initial unfavorable decision on a claim by the Agency of Original Jurisdiction (AOJ). Mayfield v. Nicholson, 444 F.3d 1328 (Fed. Cir. 2006); Pelegrini v. Principi, 18 Vet. App. 112 (2004).

This appeal arises from the Veteran's disagreement with the initial rating assigned following the grant of service connection for his narcolepsy with REM behavior disorder and without seizure disorder. As such, pertinent regulation provides that VA has no further obligation to provide notice under 38 U.S.C.A. § 5103 on this downstream element of the claim. See 38 C.F.R. § 3.159(b)(3)(1). In so providing, the courts have held that once service connection is granted, the claim is substantiated, further notice as to the "downstream" elements concerning the initial rating and effective date is not required, and any defect in the notice is not prejudicial. See Dingess v. Nicholson, 19 Vet. App. 473, 490-491 (2006); see also Hartman v. Nicholson, 483 F.3d 1311 (Fed. Cir. 2007); Dunlap v. Nicholson, 21 Vet. App. 112 (2007). Thus, because the section 5103 notice letter provided in September 2009 before the grant of service connection for narcolepsy with REM behavior disorder and without seizure disorder was legally sufficient, VA's duty to notify in this case is satisfied. See also Goodwin v. Peake, 22 Vet. App. 128 (2008); Dunlap v. Nicholson, supra. 

VA also has a duty to assist the Veteran in the development of the claim. This duty includes assisting the Veteran in the procurement of service treatment records (STRs) and pertinent treatment records and providing an examination when necessary. 38 U.S.C.A. § 5103A; 38 C.F.R. § 3.159.

Here, the Board finds that all relevant facts have been properly developed, and that all evidence necessary for equitable resolution of the issue has been obtained. His STRs and post-service VA and private treatment records have been obtained. The claims file does not present evidence that the Veteran is currently receiving disability benefits from the Social Security Administration (SSA) for the disability currently on appeal. Therefore, the Board does not need to make an attempt to obtain these records. The Board does not have notice of any additional relevant evidence that is available but has not been obtained. Additionally, the Veteran has been afforded VA examinations, and the reports of those evaluations contain all findings needed to properly evaluate his disability. 38 C.F.R. § 4.2 (2015). The Board also finds no credible lay or medical evidence demonstrating or alleging an increased severity of the disability since the most recent VA examination in October 2015. Thus, there is no duty to provide further medical examination on the claim on appeal. See VAOPGCPREC 11-95 (Apr. 7, 1995).

Furthermore, the Veteran was afforded a Board hearing in February 2014. A Board member has two duties at a hearing: (1) a duty to fully explain the issues still outstanding that are relevant and material to substantiating the claim; and, (2) a duty to suggest that a claimant submit evidence on an issue material to substantiating the claim when the record is missing any evidence on that issue or when the testimony at the hearing raises an issue for which there is no evidence in the record. See 38 C.F.R. § 3.103(c)(2) (2015); Procopio v. Shinseki, 26 Vet. App. 76 (2012) (citing Bryant v. Shinseki, 23 Vet. App. 488, 492, 496 (2010)).

Here, during the hearing, the VLJ correctly identified the issue on appeal. The Veteran was assisted at the hearing by an accredited private attorney. The VLJ and representative asked the Veteran questions about the element of the claim that was lacking to substantiate the claim for benefits (i.e., a worsening of his symptoms). The representative and the VLJ asked the Veteran questions to ascertain whether the Veteran had submitted evidence in support of this claim. In addition, the VLJ and representative sought to identify any pertinent evidence not currently associated with the claims folder that might have been overlooked or was outstanding that might substantiate the claim. Moreover, neither the Veteran nor his representative has asserted that VA failed to comply with the hearing requirements, nor identified any prejudice in the conduct of the Board hearing. By contrast, the hearing focused on the element necessary to substantiate the claim, and the Veteran, through his testimony, demonstrated that he had actual knowledge of the element necessary to substantiate his claim for benefits. As such, the Board finds that the VLJ complied with the aforementioned hearing duties, and that any error in notice provided during the Veteran's hearing constitutes harmless error.

The Board is also satisfied as to substantial compliance with its March 2015 remand directives. See Dyment v. West, 13 Vet. App. 141, 146-47 (1999); Stegall v. West, 11 Vet. App. 268 (1998). This included sending the Veteran a letter that provided him with the appropriate release form (VA Form 21-4142) to obtain any outstanding treatment records from his private physician. The Veteran was sent this letter in August 2015; however, he did not return the release forms, and all other evidence that he has indicated as relevant to his claim has been obtained. The remand also included obtaining the Veteran's recent VA treatment records, which were secured and associated with his claims file. The remand also directed the AOJ to schedule the Veteran for another VA examination. The Veteran was afforded this VA examination in October 2015. Finally, the remand asked the AOJ to readjudicate the Veteran's claim, which was accomplished in the January 2016 Supplemental Statement of the Case (SSOC). Thus, the Board finds that there has been substantial compliance with its remand directives. Id.

For the foregoing reasons, the Board concludes that all reasonable efforts were made by the VA to obtain evidence necessary to substantiate the Veteran's claim. Therefore, no further assistance to the Veteran with the development of evidence is required.

II. Initial Rating Claim

Disability evaluations are determined by the application of a schedule of ratings which is based on the average impairment of earning capacity in civil occupations. Separate DCs identify the various disabilities. See 38 U.S.C.A. § 1155; 38 C.F.R. § Part 4 (2015).

Where a veteran appeals the initial rating assigned for a disability at the time that service connection for that disability is granted, evidence contemporaneous with the claim and with the initial rating decision granting service connection would be most probative of the degree of disability existing at the time that the initial rating was assigned and should be the evidence "used to decide whether an original rating on appeal was erroneous . . . ." Fenderson v. West, 12 Vet. App. 119, 126 (1999). If later evidence indicates that the degree of disability increased or decreased following the assignment of the initial rating, "staged" ratings may be assigned for separate periods of time based on facts found. Id.

The Veteran is in receipt of a 80 percent initial disability rating under 38 C.F.R. 
§ 4.124a, DC 8108 for his narcolepsy with REM behavior disorder and without seizure disorder. He seeks a higher initial disability rating.

DC 8108 refers to narcolepsy, and directs that narcolepsy should be rated as epilepsy, petit mal. 38 C.F.R. § 4.124a.

DC 8911 refers to epilepsy, petit mal, and instructs the rater to rate the disability under the General Rating Formula for Minor Seizures. 38 C.F.R. § 4.124a. Under the General Rating Formula for Major and Minor Epileptic Seizures, a 80 percent disability rating is assigned when the veteran averages at least one major seizure in three months over the last year, or more than ten minor seizures weekly. A 100 percent disability rating is assigned when the veteran averages at least one major seizure per month over the last year. 38 C.F.R. § 4.124a, DC 8911. Note (1) states that a major seizure is characterized by the generalized tonic-clonic convulsion with unconsciousness. Note (2) states that a minor seizure consists of a brief interruption in consciousness or conscious control associated with staring or rhythmic blinking of the eyes or nodding of the head ("pure" petit mal), or sudden jerking movements of the arms, trunk, or head (myoclonic type) or sudden loss of postural control (akinetic type). Id.

In applying the above law to the facts of the case, the Board finds that the Veteran is not entitled to an initial disability rating in excess of 80 percent for his narcolepsy with REM behavior disorder and without seizure disorder. Here, there is no evidence of the equivalent of one major seizure per month over the last year, to warrant a 100 percent disability rating. 38 C.F.R. § 4.124a, DCs 8108-8911.

Specifically, Dr. W.H., the Veteran's treating private physician, submitted a medical opinion in July 2009. Dr. W.H. diagnosed the Veteran with narcolepsy and REM behavioral disorder. The physician stated that the Veteran had a history of narcoleptic sleep attacks in excess of 30 per week, according to the Veteran, when he was in the military.

In October 2009, Dr. R.R., the Veteran's treating private physician, submitted a medical opinion. Dr. R.R. stated that the Veteran's diagnosis was narcolepsy. Dr. R.R. stated that individuals with this diagnosis could not control their proclivity to fall asleep whether on the job or even at rest in their homes.

The Veteran was afforded a VA QTC examination in November 2009. At the examination, the Veteran reported greater than seven thousand attacks during the past two years, averaging three thousand per month. The Veteran kept an attack diary. Following a review of some of the Veteran's medical records, the examiner diagnosed the Veteran with narcolepsy that was unrelated to a seizure disorder.

In a January 2010 medical opinion, Dr. W.H. stated that narcolepsy and a seizure disorder were "two very different problems but [the Veteran] should be rated under the general formula for seizures." Dr. W.H. indicated that, according to the Veteran, the Veteran experienced two sleep attacks per day. Dr. W.H. added that narcolepsy, as far as a medical problem, was "as bad and probably worse than a seizure disorder as far as daily living and working."

In July 2010, the Veteran was provided a VA QTC examination. At the examination, the Veteran stated that over the last two years he did not know the total number of attacks but he averaged fifty each month. The Veteran's diary records the dates of the attacks and showed four to five attacks per day. The Veteran experienced four sleeping attacks during the day that lasted for less than five minutes. The Veteran reported that it was hard for him to wake up in the morning and he was frequently late for work. The examiner diagnosed the Veteran with narcolepsy and found that the Veteran did not have a seizure disorder.

In October 2011, Dr. W.H. provided another medical opinion. Dr. W.H. stated that, from a medical standpoint, narcolepsy and seizure disorder are two very different problems and the Veteran should not be evaluated based on seizures as far as his service connection. Dr. W.H. indicated that the Veteran suffered from 3-4 sleep attacks per day.

In a February 2014 statement, the Veteran's co-worker reported working with the Veteran for the past five years. He stated that he had observed the Veteran on numerous occasions that the Veteran would have difficulty staying awake at work. Sometimes, the Veteran's eyes would roll back into his head and for a period of time ranging from a minute to several minutes, he would not be aware of his surroundings and would appear to be in a deep sleep. The Veteran would then snap back awake and would become aware that time had passed. The co-worker stated that the Veteran's sleep attacks ranged from one minute to fifteen minutes. The Veteran could have several sleep attacks in one eight hour workday.

In October 2015, the Veteran was afforded a VA examination. The Veteran reported falling asleep driving and at work and while sitting on a couch talking or in a chair. The Veteran described excessive daytime sleepiness with three to five attacks per day that required him to "power nap." The VA examiner diagnosed the Veteran with narcolepsy with REM behavioral disorder and without seizure disorder. The Veteran required continuous medication for the control of his narcolepsy. The examiner found that the Veteran's narcolepsy was manifested by excessive daytime sleepiness, sleep attacks (where the Veteran had a strong urge to sleep, followed by a short nap), and hallucinations. The Veteran had rhythmic blinking and loss of consciousness during sleep attacks, vivid hallucinations when entering or exiting sleep attacks, and confusion during conversations. The Veteran did not have cataplexy (a sudden loss of muscle tone while awake, resulting in a brief inability to move) or sleep paralysis (an inability to move on first awakening). The examiner found that the Veteran experienced more than 10 narcoleptic episodes per week. During these narcoleptic episodes, the Veteran would fall into REM sleep during typing, talking, sitting, or reading. The Veteran stated that witnesses report that, during these narcoleptic episodes, the Veteran's eyes roll back into his head, he has confusing conversations, he answers phone calls and does not recall doing so, his head nods, and he has vivid dreams, sometimes resulting in involuntary body jerks or movements. The Veteran reported three to five attacks a day (21-25/week). The examiner found that the Veteran had frequent unpredictable attacks of sudden onset of sleep, which precluded his ability to perform activities that required uninterrupted attention, such as using heavy/dangerous equipment, driving, working at heights, and monitoring important activities. In addition, he had difficulty concentrating at times, which impacted his ability to work.

The October 2015 VA examiner added an addendum medical opinion to the examination report, in which he found that the Veteran has three to five narcoleptic
sleep attacks daily (21-35 attacks "per week," or 84-140 "per month"). The examiner stated that the Veteran's service-connected disability was not a seizure disorder as defined by the medical community. The idiosyncratic classification that
the VA has chosen to give narcolepsy as "congruent with petit mal seizures" is an administrative one. However, because there is no medical or physiological basis for this conflation, it would be inaccurate and inappropriate for a medical professional to equate these two very different conditions in rendering an independent medical opinion. Similarly, if the narcolepsy attacks were "rated as congruent with" or considered "equivalent to" for example, myocardial infarctions, it would nonetheless be inappropriate for a medical professional to opine that the claimant is
having three to five myocardial infarctions daily. The examiner stated that it was of course the prerogative of the VA to rate the effect of narcoleptic attacks as equivalent to that of petit mal or minor seizures (or of any other condition chosen). However, this was not a medical equivalency and a medical provider could not make it be so by opinion.
The remaining VA and private treatment records in the claims file do not provide contrary evidence to that obtained at the VA examinations.

Since the effective date of service connection (July 30, 2009), the competent lay and medical evidence reflects that the service-connected narcolepsy with REM behavior disorder and without seizure disorder has been manifested by no more than 5 episodes of sleep attacks per day, which is considered analogous to minor seizures manifested by brief interruptions in consciousness. 38 C.F.R. § 4.124a, DC 8911. There is also no medical evidence of cataplexy, and the preponderance of the medical evidence is against a finding that the frequency of the Veteran's narcoleptic episodes more nearly approximates a major seizure as contemplated by the rating criteria. Thus, in applying the above law to the facts of the case, the Board finds that the Veteran is not entitled to an initial disability rating in excess of 80 percent for his narcolepsy with REM behavior disorder and without seizure disorder. Throughout the appeal period, the Veteran's narcoleptic episodes have been most equivalent to minor seizures manifested by brief interruptions in consciousness, which warrants the current 80 percent disability rating. 38 C.F.R. § 4.124a, DCs 8108-8911.

A higher 100 percent disability rating is not warranted because the Veteran's sleep attacks are not analogous to a major seizure as contemplated by the rating criteria under DC 8911. The preponderance of the evidence of record is against a finding that the frequency of the Veteran's narcoleptic episodes is equivalent to a major seizure as manifested by tonic-clonic convulsions with unconsciousness. The evidence of record does not document any tonic-clonic convulsions during the Veteran's sleep attacks, and the Veteran has not reported such symptoms. Throughout the appeal period, the Veteran has been able to work full-time and fight off sleep attacks at work if needed. He does not require immediate medical attention following a sleep attack, and often just requires a "power nap." Thus, the Board finds that the evidence of record documents that the Veteran's narcoleptic episodes are most equivalent to minor seizures manifested by brief interruptions in consciousness, which warrants the current 80 percent disability rating. 38 C.F.R. 
§ 4.124a, DCs 8108-8911.

Furthermore, the Veteran's symptoms do not appear to have changed significantly during this initial rating period so as to warrant a staged rating. Fenderson, 12 Vet. App. at 126. 

The Board notes that in adjudicating a claim, the competence and credibility of the Veteran must be considered. See Buchanan v. Nicholson, 451 F.3d 1331 (Fed. Cir. 2006); Washington v. Nicholson, 19 Vet. App. 362, 368-69 (2005). The Board acknowledges that the Veteran and his co-worker are competent to give evidence about what they observe or experience. For example, the Veteran is competent to report that he experiences certain symptoms, such as trouble staying awake, and his friend is competent to report that the Veteran falls asleep several times during the day, and they are both credible in this regard. See, e.g., Layno v. Brown, 6 Vet. App. 465 (1994). The Veteran's competent and credible belief that his disability is worse than the assigned rating, however, is outweighed by the competent and credible medical examinations that evaluated the true extent of impairment based on objective data coupled with the lay complaints. The VA examiners have the training and expertise necessary to administer the appropriate tests for a determination on the type and degree of the impairment associated with the Veteran's complaints. For these reasons, greater evidentiary weight is placed on the physical examination findings. Also, as stated above, the rating criteria are specific in indicating that some of the criteria must be objectively demonstrated. 

In sum, the preponderance of the evidence is against the assignment of an initial disability rating in excess of 80 percent for the service-connected narcolepsy with REM behavior disorder and without seizure disorder at any time during the appeal period. Thus, the claim is denied. 38 U.S.C.A. § 5107; 38 C.F.R. § 3.102; see Gilbert v. Derwinski, 1 Vet. App. 49, 53 (1990).

The above determination is based on application of provisions of the VA's Schedule for Rating Disabilities. 38 C.F.R. Part 4 (2015). However, the regulations also provide for exceptional cases involving compensation. Pursuant to 38 C.F.R. 
§ 3.321(b)(1) (2015), the VA Under Secretary for Benefits or the Director of the Compensation and Pension Service is authorized to approve an extraschedular evaluation if the case "presents such an exceptional or unusual disability picture with such related factors as marked interference with employment or frequent periods of hospitalization as to render impractical the application of the regular schedular standards." 38 C.F.R. § 3.321(b)(1). 

The question of an extraschedular rating is a component of a claim for an increased rating. See Bagwell v. Brown, 9 Vet. App. 337, 339 (1996). Although the Board may not assign an extraschedular rating in the first instance, it must specifically adjudicate whether to refer a case for extraschedular evaluation when the issue either is raised by the claimant or is reasonably raised by the evidence of record. Barringer v. Peake, 22 Vet. App. 242 (2008). 

If the evidence raises the question of entitlement to an extraschedular rating, the threshold factor for extraschedular consideration is a finding that the evidence before VA presents such an exceptional disability picture that the available schedular evaluations for that service-connected disability are inadequate. Therefore, initially, there must be a comparison between the level of severity and symptomatology of a veteran's service-connected disability with the established criteria found in the rating schedule for that disability. Thun v. Peake, 22 Vet. App. 111 (2008). 

If the criteria reasonably describe the claimant's disability level and symptomatology, then a veteran's disability picture is contemplated by the rating schedule. The assigned schedular evaluation is, therefore, adequate, and no referral is required. In the second step of the inquiry, however, if the schedular evaluation does not contemplate the claimant's level of disability and symptomatology, and is found inadequate, the RO or Board must determine whether the claimant's exceptional disability picture exhibits other related factors such as those provided by the regulation as "governing norms." 38 C.F.R. 3.321(b)(1) (related factors include "marked interference with employment" and "frequent periods of hospitalization"). 

Here, because the schedular rating for the Veteran's narcolepsy with REM behavior disorder and without seizure disorder fully addresses his symptoms, which include mainly involuntary sleep attacks with vivid dreams and body movements, referral to the VA Under Secretary for Benefits or the Director of Compensation and Pension Service for consideration of an extraschedular evaluation is not warranted. A comparison between the level of severity and symptomatology of the narcolepsy with REM behavior disorder and without seizure disorder with the established criteria shows that the rating criteria reasonably describe the Veteran's disability level and symptomatology. Specifically, the Veteran reports involuntary sleep attacks with vivid dreams and body movements. The regulations address these symptoms, and the Veteran's symptoms were considered in assigning him his current disability rating. However, even with consideration of his symptoms, the VA examiners determined that his symptoms are more equivalent to minor seizures, which does not warrant a higher disability rating. Thus, the Veteran's symptoms of involuntary sleep attacks with vivid dreams and body movements were considered in the regulations. There is no credible evidence that the Veteran's service-connected disability causes impairment that is not contemplated by the schedular rating criteria or that renders impractical the application of the regular schedular standards. See Thun, 22 Vet. App. at 111. Accordingly, referral of this case for consideration of an extraschedular rating is not warranted. Id.; see also Bagwell v. Brown, 9 Vet. App. 337 (1996); Floyd v. Brown, 9 Vet. App. 88 (1996). 

Further, the Board notes that under Johnson v. McDonald, 762 F.3d 1362 (Fed. Cir. 2014), a veteran may be awarded an extraschedular rating based upon the combined effect of multiple conditions in an exceptional circumstance where the evaluation of the individual conditions fails to capture all the service-connected disabilities experienced. However, in this case, after applying the benefit of the doubt under of Mittleider v. West, 11 Vet. App. 181 (1998), there are no additional service-connected disabilities that have not been attributed to a specific service-connected condition. Accordingly, this is not an exceptional circumstance in which extraschedular consideration may be required to compensate the Veteran for a disability that can be attributed only to the combined effect of multiple conditions. 

Finally, pursuant to Rice v. Shinseki, 22 Vet. App. 447 (2009), a claim for a total disability rating based in individual unemployability due to service-connected disabilities (TDIU) is considered part and parcel of an increased rating claim when the issue of unemployability is raised by the record. In this case, the issue of unemployability is not raised by the record. At the July 2010 VA examination and in a co-worker's February 2014 statement, the Veteran was currently employed. There is no allegation that his service-connected narcolepsy with REM behavior disorder and without seizure disorder has resulted in unemployment. The narcolepsy with REM behavior disorder and without seizure disorder has resulted in functional impairment (but not unemployment), and the functional impairment is contemplated by his current 80 percent disability rating. Therefore, consideration of a TDIU is not warranted. 

ORDER

The claim of entitlement to an initial rating in excess of 80 percent for narcolepsy with REM behavior disorder and without seizure disorder is denied.

____________________________________________
WAYNE M. BRAEUER 
Veterans Law Judge, Board of Veterans' Appeals

Department of Veterans Affairs